IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **JAMES SHAROS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 14-cv-1274-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff James Sharos seeks judicial review of the final agency decision denying his late wife's application for Disability Insurance Benefits pursuant to 42 U.S.C. § 423.[2]

### Procedural History

Plaintiff's late wife, Sherry L. Sharos, applied for benefits in September 2011, alleging disability beginning on October 31, 2004. After holding an evidentiary hearing, ALJ Christopher Hunt denied the application on February 24, 2014. (Tr. 28-33). The Appeals Council denied review and the ALJ's decision became the final agency decision subject to judicial review. (Tr. 1).

Administrative remedies have been exhausted and a timely complaint was

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 14.
[2] If plaintiff's late wife is determined to be entitled to benefits, those benefits would be payable to plaintiff as her surviving spouse. See, 42 U.S.C. §404(d)(1). As Mr. Sharos' claim is entirely derivative, the Court will refer to Sherry Sharos as "plaintiff" for convenience.

filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.   Whether the ALJ's finding of non-disability was supported by substantial evidence.

2.   Whether the ALJ erred in failing to discuss prescription medication taken by plaintiff during the period in issue.

3.   Whether plaintiff's alleged mental impairment combined with her physical impairments would render her disabled.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

In a DIB case, a claimant must establish that she was disabled as of her date last insured.   *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).    It is

2

not sufficient to show that the impairment was present as of the date last insured; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date.   *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

3

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job**.** *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). See also, *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Sharos was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971). In reviewing for "substantial

4

evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Hunt followed the five-step analytical framework described above.   He determined that plaintiff had not worked since the alleged onset date and that she was insured for DIB only through September 30, 2010.   At step two, he found that, from the alleged onset date through September 30, 2010, Ms. Sharos had medically determinable impairments of history of left ankle fracture and hypertension.   He found that she did not have a medically determinable mental impairment during that period.   However, he concluded that her impairments were not severe because they did not significantly limit her ability to do basic work activities for a period of twelve consecutive months.   Therefore, she was not disabled as of the date last insured.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.   As plaintiff does not raise an issue as to her physical impairments, the Court will focus primarily on the evidence relating to her mental condition.

### 1.   Agency Forms

Plaintiff was born in 1953, and was 51 years old on the alleged onset date of October 31, 2004.  (Tr. 223).  She alleged disability due to generalized anxiety disorder, major depression, shattered ankle with permanent nerve damage, endometriosis, perforated ear drum, and a "nervous breakdown."  (Tr. 226).

Plaintiff said that she stopped working on October 31, 2004, because she was unable to concentrate and function properly.  (Tr. 226).  She had worked as a dispatcher and secretary for a municipal police department from 1975 to 1979, and as a secretary for a lawn care company from 1998 to October 2004.   (Tr. 227).

James Sharos submitted a report in October 2011 in which he explained that his wife had been sexually abused as a child.  She had long-standing mental problems including anxiety, depression, night terrors, and fear, and she finally had a "complete nervous & mental breakdown" in December 2010.   (Tr. 259).

James Sharos also reported that he owned the lawn care company that employed Sherry Sharos from 1998 to 2004.   He stated that the company paid her for work that she basically could not do.  (Tr. 297).   James submitted a letter in September 2013 stating that, during her employment, "she could not even do the basic duties of answering the phones."  She would sleep all day and stay up all night.  James did all of the household duties.  "This continued for many years until Sherry finally had the nervous breakdown in December 2010."  (Tr. 328).

### 2.   Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on February 19, 2014.   (Tr. 2).

6

Sherry testified that she had been treated with electroshock therapy in the 1970s.   (Tr. 50).

Sherry testified that she was able to do the secretary job for her husband's lawn care company correctly at first, but later she became unable to answer the phone.   She also got to the point where she could not leave her room.   She had hallucinations and could not sleep.   This was during the period while she was still employed by the lawn care company.     (Tr. 51-52).   She did not get any treatment for mental problems during that period.   (Tr. 54).   From 2006 to 2010, Dr. Fozard treated her for physical problems but he also prescribed medicine for her mental problems.   He prescribed Elavil (amitriptyline) to help her sleep.   She did not tell the doctor that she had hallucinations because she was embarrassed.   The medicine did not stop her problems.   (Tr. 55-57).

James Sharos testified that he hired Sherry to work as a secretary in 1998. She did the job adequately for some period of time, but then she "just wouldn't wake up anymore" and did not answer the phone or do the invoices at the end of the month.   This was in the early 2000s.   He terminated her in 2004.   He waited to fire her because "it wasn't easy to terminate my wife."   In 2002 to 2004, Sherry was very depressed and had a lot of anxiety.   She was treated by Dr. Fozard, who prescribed Elavil for sleep and Valium for anxiety.   She did not like to tell the doctor about her emotional or mental problems.   James told the doctor "certain things."   (Tr. 67-70).

James testified that, from 2004 to 2009, Sherry continued to be depressed and anxious.   She did not want to leave the house to go anywhere.   She would go

without sleep for days and become delusional.   He said that he reported this to Dr. Fozard.   (Tr. 70-72).

### 3.    Relevant Medical Treatment

Plainitff was admitted to the hospital with a fractured left ankle in October 1985.   She was taking Valium[3] as needed and Fiorinal for ulcer pain.   (Tr. 583, 612).   She was admitted to the hospital again in 1986 for removal of the hardware from her left ankle.   The notes indicate she had undergone shock treatments in 1978 and 1980.   She was still taking Valium as needed.   (Tr. 684).

Plaintiff underwent physical therapy for neuritis in her left leg beginning in January 1988.   She was taking Tegretol, Tylenol and Elavil.[4]   (Tr. 701).

Plaintiff was admitted to the hospital for excessive uterine bleeding in September 1991.   The admitting note indicates that her regular medications included Tegretol, occasional Tylenol #4, and Elavil.   (Tr. 647).   She returned to the hospital for a hysterectomy in January 1992.   It was noted that she had a prior left ankle fracture and a subsequent nerve block procedure for "ankle damage." She was taking Tegretol, Elavil and Meclomen.

None of the above records contain any mention of depression or anxiety.

Sherry called Dr. Gregg Fozard's office on April 7, 2005, and asked that her diazepam be refilled.   She saw Dr. Fozard on April 13, 2005.   On that date, he

---

[3] Valium (diazepam) is used to treat anxiety disorders, alcohol withdrawal symptoms, muscle spasms, seizures, and other conditions.   http://www.drugs.com/diazepam.html, visited on May 16, 2016.

[4] Elavil (amitriptyline) is used to treat depression.   http://www.drugs.com/amitriptyline.html, visited on May 16, 2016.   Tegretol is used to treat certain seizures and to control nerve pain. http://www.drugs.com/tegretol.html, visited on May 16, 2016.

noted that Sherry was "now on amitriptyline for neuropathy in the left ankle."    The assessment was hypertension, neuropathy in left ankle, and chronic low back pain. There is no mention of depression or anxiety.    (Tr. 494).    Sherry saw Dr. Fozard about every six months through March 2010.    He continued to refill her prescriptions for amitriptyline and diazepam, but he never noted a complaint or diagnosis of depression or anxiety.    (Tr. 477-508).    On March 16, 2010, Sherry complained of trouble sleeping and trouble with allergies.    She had gotten some melatonin from her brother, which helped her sleep.    Dr. Fozard diagnosed insomnia and prescribed melatonin.    (Tr. 476).    He continued to refill her prescriptions for amitriptyline and diazepam.

Sherry was last insured for DIB as of September 30, 2010.

On November 4, 2010, Sherry saw Dr. Fozard for a check-up.    She had some numbness in her 4th and 5th fingers on the left hand.    The doctor noted that she "[d]oes a lot of computer work."    There was no mention of trouble sleeping, depression or anxiety.    She was to continue on her current medications.    (Tr. 472-475).

On December 20, 2010, Sherry was taken to the emergency room because she was confused and disoriented.    She was agitated, "bizarre," and incoherent. A note the next day stated that she had a history of anxiety but no other mental health history.    She was admitted to the hospital.    (Tr. 429-438).

Sherry was hospitalized with a diagnosis of major depressive disorder with psychosis.    The discharge summary notes that she had a history of anxiety and a reported psychiatric hospitalization in the 1970s.    She was treated in the hospital

with Celexa for depression and Haldol for psychosis.   The note states that Sherry "recognized that she had been depressed for a while and it was nice to be able to open up and talk to people."   She was discharged on December 27, 2010.   She was to follow up with Dr. Johnson.   (Tr. 425-426).

During her hospitalization, a social worker noted on December 23, 2010, that plaintiff said she had been "isolating at home for the last 15 years, more so recently.   Much self talk and delusional thoughts."   She was worried about her alcoholic son and other family issues.   She had a supportive husband of many years.   (Tr. 943).   Sherry indicated that she was employed part-time; she was a housewife and "assists husband w/ lawn service."   (Tr. 945).

On December 28, 2010, the day after she was released from the hospital, Sherry saw Dr. Fozard.   He noted that she "had a history of mental problem with depression and had shock treatment in 1975."   (Tr. 471).

Sherry began seeing Dr. Christopher Johnson, a psychiatrist, in January 2011.   He diagnosed major depression, recurrent, moderate, and generalized anxiety disorder.   He saw her about once a month and prescribed medication for her.   (Tr. 518-526).   In June 2011, she had another possible psychotic episode, and he added Risperdal, an antipsychotic drug.   (Tr. 527-528).   She had another episode of confusion and delusions around Christmas.   Dr. Johnson switched her from Risperdal to Seroquel in January 2012.   (Tr. 765-766).   In April 2012, Sherry told Dr. Johnson that she had "significant episodes of depression in the past."   (Tr. 759).   In May 2012, she reported that she was doing fairly well on Seroquel, but she still had some difficulty with sleep and some anxiety and panic

symptoms.   (Tr. 757-758).   In August 2012, she reported that her anxiety had kept her from attending a shower for a relative and doing some other things as well. Dr. Johnson increased her antianxiety medication.   (Tr. 753-754).

## Analysis

Plaintiff's second point is well-taken and requires remand.

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it."   *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).   This rule is long-standing.   See, *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009), and cases cited therein.

As is detailed above, the medical records establish that Sherry was prescribed Valium (Diazepam) and Elavil (amitriptyline) for years before her date last insured for DIB.   Dr. Fozard regularly renewed these prescriptions beginning in at least 2005.   (Tr. 494).   Sherry testified that Dr. Fozard prescribed medication for her mental problems.   (Tr. 55).   However, the ALJ ignored this testimony and simply cited Sherry's testimony that she had no "mental health treatment" before her date last insured.   In reviewing Dr. Fozard's treatment, the ALJ did not mention these prescriptions at all.   (Tr. 32).

Of course, the fact that plaintiff was prescribed Valium and Elavil during the insured period does not, of itself, establish that she was disabled at that time.   It was, however, evidence that should have been considered by the ALJ, along with the testimony of plaintiff and her husband and her children's written statements

11

regarding her mental impairments.   The ALJ said he gave "no weight" to the statements of Sherry's family, but gave no reason for that assessment.   (Tr. 33).

The Commissioner argues that Dr. Fozard's records indicated that amitriptyline was prescribed for neuropathy.   See, doc. 27, p. 6.   That is accurate, but the ALJ did not discount Sherry's use of amitriptyline for that reason.   In advancing reasons not relied upon by the ALJ, the Commissioner violates the *Chenery* doctrine.   See, *SEC v. Chenery Corporation*, 318 U.S. 80 (1943). "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace."   *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012).

Sherry had a psychotic episode and was hospitalized for a week in December 2010.   The diagnosis was major depressive disorder with psychosis. This was only about two and a half months after her insured status lapsed.   The ALJ concluded that she went from having no medically determinable mental impairment to having major depressive disorder with psychosis in two and a half months.   However, he ignored evidence that she was prescribed Valium and Elavil before her date last insured.   While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position."   *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

The ALJ is "required to build a logical bridge from the evidence to [his] conclusions."   *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).   ALJ Hunt failed to do so here.   As a result, his decision is lacking in evidentiary support and must be remanded.   *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

SSR 83-20 is instructive here.   "The onset date of disability is defined as "the first day an individual is disabled as defined in the Act and the regulations."   SSR 83-20, 1983 WL 31249, at *1.   For disabilities of non-traumatic origin, SSR 83-20 requires the ALJ to consider three things when determining the onset date of disability: the claimant's allegations, the claimant's work history, and the medical and other evidence.   SSR 83-20 at *2.   The date alleged by the claimant is the "starting point" in determining the onset date, and that date should be used if it is consistent with all available evidence.   SSR 83-20, at *2, 3.   The medical evidence is "the primary element in the onset determination" and the chosen onset date "can never be inconsistent with the medical evidence of record."   SSR 83-20 at *2.   "This does not mean that a claim is doomed for lack of medical evidence establishing the *precise* date an impairment became disabling."   *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 353 (7th Cir. 2005) (emphasis in original).   "In such cases, the ALJ must infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process, and should seek the assistance of a medical expert to make this inference."   *Briscoe*, 425 F.3d at 353 (citing SSR 83-20 at *2) (internal quotation marks omitted).

Where the claimant has been hospitalized for a psychiatric illness:

The history [set forth in a hospital report] may present significant information about the individual's condition prior to admission. Depending on the nature of events leading to institutionalization, onset of disability may sometimes be found at a time considerably in advance of admission. It is not unusual for the history to show that prior to hospitalization the person manifested personality changes such as refusing to go out of the house, refusing to eat, accusing others of being against him or her, threatening family and neighbors, etc. In such a case, a beginning date prior to hospitalization would be reasonable unless contradicted by the work history

or other evidence.

SSR 83-20 at *4.

The Court does not mean to suggest that the ALJ was required to consult a medical expert. "Should" does not mean "must" or "shall." *Eichstadt v. Astrue*, 534 F.3d 663, 667 (7th Cir. 2008). Where the medical evidence is complete, the ALJ is not required to consult a medical expert. *Henderson*, 179 F.3d at 513. See, also, *Pugh v. Bowen*, 870 F.2d 1271, 1278 n. 9 (7th Cir.1989). The Court only notes that the ALJ might consider doing so on remand. In addition, it appears that no one asked Dr. Fozard to explain why he prescribed Valium and Elavil before September 30, 2010, and whether he diagnosed any mental impairment before that date.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Sharos was disabled before September 30, 2010, or that she should be awarded benefits for the period in question. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Sherry Sharos' application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   May 17, 2016.**


<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**

15